# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

Docket No. 22-3075

---

DAVID SCHAFFNER, JR. AND THERESA SUE SCHAFFNER,

Plaintiffs-Appellees,

v.

MONSANTO COMPANY,

Defendants-Appellants.

---

## BRIEF OF APPELLEES DAVID SCHAFFNER, JR.
## and THERESA SCHAFFNER

---

On appeal from a judgment entered in the United States District Court for the Western District of Pennsylvania on October 3, 2022, in Docket No. 2:19-cv-1270, seeking reversal of an order entered in the United States District Court for the Northern District of California on February 25, 2022, in Docket No. 2:19-cv-7526.

---

Adrian N. Roe
Michael D. Simon
**Roe & Simon LLC**
2520 Mosside Boulevard,
Monroeville, PA 15146
(412) 856-8107

Charles L. Becker
Tobi M. Millrood
Ruxandra M. Laidacker
**Kline & Specter, PC**
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000

*Attorneys for David Schaffner, Jr.
and Theresa Schaffner*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iii

I.    ISSUES PRESENTED FOR REVIEW ..................................... 1

II.   RELATED CASES............................................................ 1

III.  STATEMENT OF THE CASE .................................................. 2

      A.   Introduction ......................................................... 2

      B.   The statutory framework of FIFRA.................................... 3

      C.   A brief history of Roundup .......................................... 6

           1.   Monsanto repeatedly failed to assess Roundup's risk for
                carcinogenicity ......................................... 6

           2.   In 2015, the International Agency for Research on Cancer
                concluded that glyphosate is a probable carcinogen, after
                which EPA authorized labels referencing IARC's cancer
                conclusion ........................................... 13

           3.   The Ninth Circuit vacated EPA's assessment that
                glyphosate is not likely to cause cancer................ 16

      D.   The procedural history of this litigation.......................... 17

           1.   David and Theresa Schaffner sued for injuries caused by
                Mr. Schaffner's exposure to Round-Up.................... 17

           2.   In Hardeman, the Ninth Circuit rejected the same
                preemption arguments Monsanto makes here ............... 18

           3.   The MDL court rejected Monsanto's preemption arguments
                based on its earlier decisions in Hardeman and PTO 101..... 22

           4.   Settlement paved the way for this appeal ............... 23

IV.    SUMMARY OF ARGUMENT ................................................... 24

V.    ARGUMENT ............................................................................. 27

    A.    FIFRA does not expressly preempt Mr. Schaffner's claim sounding in failure to warn. ............................................. 27

        1.    The standard of review ........................................... 27

        2    FIFRA's express preemption language does not bar Plaintiff's failure-to-warn claim ............................ 27

        3    Monsanto's contrary arguments lack merit ........................... 33

    B.    FIFRA does not impliedly preempt Mr. Schaffner's claim sounding in failure to warn. ............................................. 40

        1.    The standard of review ........................................... 40

        2.    Implied preemption is not available under FIFRA ............... 40

        3.    FIFRA does not impliedly preempt Plaintiff's claim under impossibility preemption ...................................... 42

    C.    Monsanto's preemption arguments are foreclosed by principles of issue preclusion and law of the case. ............................... 47

        1.    The standard of review ........................................... 47

        2.    Monsanto's arguments are precluded by *Hardeman* ............ 47

VI.    CONCLUSION ........................................................................ 55

COMBINED CERTIFICATIONS

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
501 U.S. 104 (1991) ............................................................... 48

*Bates v. Dow Agrosciences*,
544 U.S. 431 (2005) ....................................................... passim

*Chapman v. Monsanto Co.*,
2022 WL 3971287 (S.D. Tex. Aug. 31, 2022) ................................................ 10, 44

*Cohen v. ConAgra Brands, Inc.*,
16 F.4th 1283 (9th Cir. 2021) ........................................................ 33, 39

*Commonwealth v. Monsanto Co.*,
269 A.3d 623 (Pa. Cmwlth. 2021) .......................................................... 30

*Conte v. Wyeth, Inc.*,
168 Cal. App. 4th 89 (2008) .......................................................... 31, 52

*Delaware River Port Authority v. Fraternal Order of Police*,
290 F.3d 567 (3d Cir. 2002) .................................................................. 48

*Fellner v. Tri-Union Seafood, L.L.C.*,
539 F.3d 237 (3d Cir. 2008) .......................................................... 35, 42

*Griffith v. United Air Lines, Inc.*,
203 A.2d 796 (Pa. 1964) ...................................................................... 30

*Hardeman v. Monsanto Company*,
997 F.3d 941 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2834 (2022) .............. passim

*High v. Pennsylvania Supply, Inc.*,
154 A.3d 341 (Pa. Super. 2017) .......................................................... 30

*Home Depot USA, Inc. v. Lafarge North America, Inc.*,
59 F.4th 55 (3d Cir. 2023) ...................................................................... 49

*In re: Asbestos Products Liability Litig. (No. VI)*,
873 F.3d 232 (3d Cir. 2017) ...................................................................47

*In re City of Philadelphia Litig.*,
158 F.3d 711 (3d Cir. 1998) ...................................................................53

*In re Pharmacy Benefit Managers Antitrust Litig.*,
582 F.3d 432 (3d Cir. 2009) ...................................................................54

*In re Roundup Product Liability Litig.*,
214 F. Supp. 3d 1346 (J.P.M.L. 2016) ..............................................1, 54

*In re Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig.*,
664 F.2d 114 (6th Cir. 1981) ..................................................................54

*Indian Brand Farms, Inc. v. Novartis Crop Protection, Inc.*,
617 F.3d 207 (3d Cir. 2010)....................................................................33

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
457 F.3d 244 (3d Cir. 2006)....................................................................48

*Keefe v. Prudential Prop. & Cas. Ins. Co.*,
203 F.3d 218 (3d Cir. 2000).....................................................................24

*Kremer v. Chemical Constr. Corp.*,
456 U.S. 461 (1982) ................................................................................48

*Mackowick v. Westinghouse Electric Corp.*,
575 A.2d 100 (Pa. 1990) .........................................................................30

*Medtronic v. Lohr*,
518 U.S. 479 (1996) ................................................................................31

*McKenna v. Metropolitan Life. Ins. Co.*,
126 Fed. Appx. 571 (3d Cir. 2005) .........................................................50

*Merck Sharp & Dohme Corp. v. Albrecht*,
139 S. Ct. 1668 (2019) ....................................................................passim

*Natural Resources Defense Council. v. U.S. Environmental Protection Agency*,
38 F.4th 34 (9th Cir. 2022) ........................................................... 15, 16, 36

*Phillips v. A-Best Products Co.*,
665 A.2d 1167 (Pa. 1995) ................................................... 25, 30, 35, 52

*Pilliod v. Monsanto Co*,
282 Cal. Rptr. 3d 679 (Cal. Ct. App. 2021),
*cert. denied*, 142 S. Ct. 2870 (2022) ................................. 7, 8, 10, 11, 43

*Riegel v. Medtronic, Inc.*,
552 U.S. 312 (2008) ................................................................... 33, 37, 38

*Rowland v. Novartis Pharmaceuticals Corp.*,
9 F. Supp. 3d 553 (W.D. Pa. 2014) ..................................................... 55

*Sikkellee v. Precision Airmotive Corp.*,
822 F.3d 680 (3d Cir. 2016) ........................................................... 27, 40

*Stange v. Janssen Pharmaceuticals, Inc.*,
179 A.3d 45 (Pa. Super. 2018) ............................................................. 30

*Suppan v. Dadonna*,
203 F.3d 228 (3d Cir. 2000) ................................................................. 50

*Thornton v. Tyson Foods, Inc.*,
28 F.4th 1016 (10th Cir. 2022) ...................................................... 39, 40

*United States v. Mead Corp*,
533 U.S. 218 (2001) ...................................................................... 36, 45

*Walton v. Avvo Corp.*,
610 A.2d 454 (Pa. 1992) ...................................................................... 30

*Witkowski v. Welch*,
173 F.3d 192 (3d Cir. 1999) .......................................................... 47, 49

*Wyeth v. Levine*,
555 U.S. 555 (2009) .............................................................................. 28

**Statutes:**

7 U.S.C. § 136(q)(1)(F); ...............................................................4, 34, 35

7 U.S.C. § 136(q)(1)(G) ........................................4, 19, 252, 29, 34

7 U.S.C. § 136a(a) ..........................................................................3

7 U.S.C. § 136a(c)(5)(B) ...............................................................4

7 U.S.C. § 136a(c)(5)(C) ...............................................................4

7 U.S.C. § 136a(c)(5)(D) ...............................................................4

7 U.S.C. § 136a(f)(1). ...................................................................46

7 U.S.C. § 136a(f)(2). ............................................................passim

7 U.S.C. § 136d(b); ........................................................................5

7 U.S.C. § 136j(a)(1)(E) ................................................................4

7 U.S.C. § 136*l* .............................................................................5

7 U.S.C. § 136v(a). ................................................................passim

**Regulations:**

40 C.F.R. 159.158 .......................................................................4, 9

40 C.F.R. § 152.46(a) ..................................................................46

**Other Authority:**

18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper,
Federal Practice and Procedure § 4416 (1981) .....................................47

# I. ISSUES PRESENTED FOR REVIEW

Monsanto presents two issues for this Court's consideration:

1. Does FIFRA expressly preempt Mr. Schaffner's strict liability claim sounding in failure to warn?

2. Does FIFRA impliedly preempt Mr. Schaffner's strict liability claim under the rubric of "impossibility" preemption?

Monsanto's appeal raises a third issues as well:

3. Should the Court decline to reach Monsanto's preemption arguments based on issue preclusion and law of the case where both the MDL court and the Ninth Circuit squarely rejected Monsanto's preemption arguments in *Hardeman v. Monsanto Company*?

# II. RELATED CASES

In 2016, the Judicial Panel on Multidistrict Litigation established a multi-district litigation proceeding in the Northern District of California for claims that the plaintiff developed non-Hodgkin's lymphoma ("NHL") resulting from Roundup exposure. *See In re Roundup Product Liability Litig.*, 214 F. Supp. 3d 1346 (J.P.M.L. 2016) (establishing MDL 2741). Mr. Schaffner's case is among the thousands of Roundup cases supervised within MDL 2741 and one of over 100,000 cases filed nationwide involving claims of cancer caused by Roundup exposure.

Like this case, *Hardeman v. Monsanto Co.*, N.D. Cal., Nos. 3:1-cv-00525-VC, 3:16-md-02741-VC, was a Roundup case supervised within MDL 2741 in which the plaintiff developed NHL resulting from Roundup exposure and asserted failure to warn claims against Monsanto. In 2016, Monsanto argued that the plaintiff's claims were preempted by the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§ 136-136y ("FIFRA"). The MDL court rejected Monsanto's preemption argument in April 2016. Appx0014. When Monsanto appealed after a jury verdict in plaintiff's favor, the Ninth Circuit rejected Monsanto's express and implied preemption arguments as a necessary dimension of affirming the judgment in the plaintiff's favor. The Supreme Court denied certiorari after receiving a brief from the United States advising that FIFRA does not preempt tort claims sounding in failure to warn. *See Hardeman v. Monsanto Company*, 997 F.3d 941 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2834 (2022); Appx0194. In turn, the MDL court relied on *Hardeman* when denying summary judgment as a global matter in MDL 2714 including in *Schaffner*. Appx0026, Appx0020, Appx0014.

## III.   STATEMENT OF THE CASE

### A.   Introduction

Plaintiffs David and Theresa Schaffner are residents of Pennsylvania. Appx0028. Mr. Schaffner worked as a professional landscaper and property owner in Butler and Allegheny Counties from 1988 until 2017. Appx0037. Mr. Schaffner

used Roundup on a nearly daily basis during these professional rules. *Id*. Mr. Schaffner did not use safety precautions when using Roundup because Monsanto marketed Roundup as safe and represented that it could be used without precautions. *Id*. Otherwise he had obtained state-issued certifications for the use of hazardous materials and regularly took precautions to avoid workplace dangers, such as using respirators when handling landscape chemicals that posed a risk of injury through inhalation. Appx0038-0039.

After two decades of Roundup exposure, Mr. Schaffner was diagnosed in 2006 with NHL at age 43. He underwent surgery and a course of chemotherapy. In 2008, Mr. Schaffner's doctors advised that Mr. Schaffner had achieved remission because the cancer had not returned. But the Schaffners live with the ongoing fear that the cancer will reoccur. *Id*. Their case seeks recovery for the injuries caused by Mr. Schaffner's Roundup-induced cancer. *Id.*; Appx0784 (expert report opining that Roundup exposure caused Mr. Schaffner's cancer based on Mr. Schaffner's exposure history, medical records, and the scientific literature). Monsanto now seeks dismissal of the Schaffners' case on grounds of FIFRA preemption.

## B.    The statutory framework of FIFRA

Under FIFRA, pesticide manufacturers must register a pesticide with EPA before selling that product in the United States. 7 U.S.C. § 136a(a). Based on information supplied by the manufacturer, EPA will register a pesticide if it

determines that, *inter alia*, (1) the product will perform its function when used in accord with common practice without causing "unreasonable adverse effects on the environment;" and (2) the product label complies with FIFRA including those provisions concerning "misbranding" of a product label. 7 U.S.C. § 136a(c)(5)(B)-(D). Manufacturers have an ongoing responsibility to update EPA with information concerning the health risks posed by a registered pesticide, and EPA reviews pesticide registrations every 15 years. § 136a(g)(1)(A); § 136j(a)(1)(E); 40 C.F.R. 159.158; *see generally Bates v. Dow Agrosciences*, 544 U.S. 431, 437-38 (2005).

Regarding the product label, FIFRA registration does not represent a conclusive determination that the label appropriately warns about a pesticide's health risks. FIFRA instead provides that registration represents only "prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of the subchapter." § 136a(f)(2). FIFRA further provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under this subchapter." *Id.* EPA also may determine that a pesticide label is "misbranded" if the agency concludes that the label lacks "a warning or caution statement . . . adequate to protect health and the environment," or if the label lacks "directions for use . . . adequate to protect health and safety." § 136(q)(1)(F)-(G); *Bates*, 544 U.S. at 438. EPA can bring enforcement actions against the manufacturer of a misbranded pesticide, including proceedings to cancel the pesticide's

registration, or to pursue civil or criminal penalties. 7 U.S.C. §§ 136d(b); 136*l*;
*Bates*, 544 U.S. at 439 & n.11.

FIFRA give the states concurrent authority to "regulate the sale or use of any
federally registered pesticide." 7 U.S.C. § 136v(a). Unlike the federal statutes
governing prescription drugs and medical devices (for example), states may
completely *ban* a pesticide's sale if a state finds "that one of the pesticide's label
approved uses is unsafe," despite EPA's approval of the label. *See Bates*, 544 U.S.
at 446 (citing § 136v(a)). This approach reflects Congress' embrace of a "relatively
decentralized scheme that preserves a broad role for state regulation" regarding
pesticide regulation *Id*. at 450.

Consistent with  FIFRA's scheme of overlapping state and federal power, the
statute's express preemption clause is narrow. *See* 7 U.S.C. § 136v(b); *Bates*, 544
U.S. at 447, 452. Under this provision, states are barred only from "impos[ing] or
continu[ing] in effect any requirements for labeling or packaging in addition to or
different from those required under this subchapter." § 136v(b). *Bates* held that a
"requirement" is "rule of law that must be obeyed," such as a duly promulgated
federal regulation. *Id*. at 445. *Bates* distinguished a "requirement" under FIFRA's
preemption language from "an event, such as "a jury verdict, that merely motivates
an optional decision." *Id*. Regarding the narrow definition of "requirements" under
FIFRA, the Court added that "[t]he long history of tort litigation against

manufacturers of poisonous substances adds force to the basic presumption against preemption." *Id*. at 449. "If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly." *Id*. That history of litigation instead "emphasizes the importance of providing an incentive to manufacturers to use the utmost care in the business of distributing inherently dangerous items." *Id*. at 450.

## C.    A brief history of Roundup.

### 1.    Monsanto repeatedly failed to assess glyphosate's risk for carcinogenicity.

Glyphosate is the active ingredient in Roundup. Roundup's history begins in the early 1970's with Monsanto's development of glyphosate as a broad-spectrum and non-selective herbicide. Glyphosate kills virtually any vegetation that it contacts—except for "Roundup Ready" crops grown from Monsanto's genetically modified seeds. It can be used practically anywhere people want to control weeds growing among crops, landscaping, and home plantings.

Monsanto obtained permission from EPA to market glyphosate under the brand name "Roundup" in 1974. Appx0034. Since then, glyphosate has become the most-used active ingredient in American agriculture. While marketing Roundup, Monsanto has told the public that Roundup is "safer than table salt' and "practically nontoxic." Appx0045-0046. Monsanto has assured people that Roundup's "safety margin is much greater than required," so that people could "feel good" about using

Roundup around their homes. *Id*. Monsanto has stated that Roundup could be used where kids and pets play. Monsanto visuals depicted people spraying Roundup while wearing shorts and a short-sleeve t-shirt, without gloves or protective eyewear. Appx0047.[1] Eventually, the New York Attorney General sued Monsanto for false advertising, resulting in a 1996 agreement under which Monsanto ceased advertising in New York that its glyphosate-based products were safe, non-toxic, and good for the environment. Monsanto did not change its Roundup marketing anywhere else. Appx0047-0048.

A data falsification scandal provided early signs that Roundup might not have been as benign as Monsanto represented. When applying to register glyphosate with EPA in the early 1970s, Monsanto contracted with a commercial laboratory known as Industrial Bio-Test Laboratories ("IBT") for performance of studies addressing whether glyphosate caused cancer or cell mutations in animals. In 1976, two years after EPA relied on those studies when registering glyphosate for commercial sale, the government discovered that IBT had falsified the study data. EPA's subsequent audit invalidated the studies and eventually three IBT executives were convicted of criminal fraud. These executives included Dr. Paul Wright, a Monsanto toxicologist

---

[1] In *Pilliod v. Monsanto Co*., 282 Cal. Rptr. 3d 679 (Cal. Ct. App. 2021), *cert. denied*, 142 S. Ct. 2870 (2022), Mrs. Pilliod testified that she thought that Roundup was "really safe to use" based on Monsanto commercials showing people spraying Roundup in shorts without gloves and given Monsanto's about using protective clothing. *Id*. at 692.

who left Monsanto to work for IBT and then returned to Monsanto until his conviction. Appx0044. However, Monsanto did not inform consumers about safety concerns arising from IBT's wrongful testing of glyphosate. It did not remove Roundup from the market. Within a few years of launch, Monsanto instead was marketing Roundup in 115 countries. *Id*.; *Pilliod*, 282 Cal. Rptr. At 629-31.

During the 1970s and early 1980s, valid studies began to emerge showing a link between glyphosate and cancer. In 1985, EPA classified glyphosate as possibly carcinogenic in humans based on a study finding that glyphosate was oncogenic in male mice. Appx0043. In the 1980s, Monsanto recognized that this classification would threaten its Roundup sales. It attacked the animal studies by hiring an expert to persuade the agency that the observed tumors were not related to glyphosate and pressured EPA to reclassify Roundup. Appx0531-0534; *Pilliod*, 282 Cal,. Rptr. At 722. EPA eventually downgraded its classification while emphasizing that it had *not* concluded that glyphosate did not cause cancer; its reclassification was simply based on "the available evidence at the time of evaluation." *Id*.

The study of glyphosate's carcinogenicity continued. By the late 1990s, several studies concluded glyphosate was a possible carcinogen in humans. These developments led Monsanto to hire world-renowned genotoxicity expert Dr. James Parry to review and rebut the studies. Dr. Parry instead concluded that glyphosate could be genotoxic and suggested tests that Monsanto should conduct to further

assess that question. Appx0346, Appx0380-400, Appx0401-0405. Monsanto refused to perform the recommended tests. It also did not share Dr. Parry's recommendations with EPA in violation of FIFRA. Appx0535-0537; 40 C.F.R. § 159.158 (describing a registrant's obligations to report information to EPA relevant to health and safety). It responded to Dr. Parry's recommendations by deciding that Dr. Parry was not the person "who can be influential with regulators and Scientific Outreach operations when genotox issues arise" and that "we simply are not going do the studies that Parry suggests." Appx0512. Monsanto's lead employee for product safety assessment, Dr. William Heydens, added that Monsanto needed to find someone "comfortable" with the genotoxic profile of glyphosate and that "Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there." *Id*. Dr. Heydens stated that glyphosate was "very vulnerable in this area," and that Monsanto needed to make finding an expert who would support glyphosate's genotoxic profile a "high priority." *Id*.

Monsanto found another expert who was willing to accept Monsanto's view of glyphosate's genotoxic profile. In 1999, Monsanto retained a pathologist at New York Medical College named Dr. Gary Williams. Appx0508. In 2000, Monsanto employees ghostwrote an article under Dr. Williams' name concluding that "under present and expected conditions of use, Roundup herbicide does not pose a health risk to humans." Appx279-80, Appx0525-0527; *Chapman v. Monsanto Co*., 2022

WL 3971287, at *9 (S.D. Tex. Aug. 31, 2022). Monsanto later used the article as "invaluable asset" when responding to regulatory agencies including EPA and a "valuable resource" when responding to product liability claims. *Id.*; Appx0574. EPA would rely repeatedly on the ghost-written Williams article in a 2016 evaluation of glyphosate's carcinogenic potential. *Id.*[2] As another court observed, "[t]his evidence [suggests] that Monsanto acted to manipulate the scientific discourse with conscious disregard for public safety." *Pilliod*, 282 Cal. Rptr. 3d at 724.

Importantly, Monsanto has never conducted or submitted to EPA any testing of formulated Roundup including all of its various ingredients. It only tested the active ingredient, glyphosate. *Id.* at 689, 691 (recounting testimony from a Monsanto toxicologist acknowledging that the company could not say that Roundup was not a carcinogen "because it had not done the necessary testing on the formulation"); Appx0228-248 (EPA report explaining that only glyphosate was studies); Appx0328 (Monsanto acknowledgments it conducted no epidemiology studies on the relationship between formulated Roundup and NHL). But Roundup itself contains

---

[2] EPA Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential 22, 98, 155 (Sept. 12, 2016), https://www.epa.gov/sites/default/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf (last visited March 15, 2023).

additional ingredients called "surfactants" that are designed to amplify glyphosate's effects. One such surfactant is polyethoxylated tallow amine ("POEA"), which enhances absorption and helps Roundup penetrate the surface of a leaf. Appx0267.[3] This chemical also increases the absorption of Roundup into human skin and thus can increase human exposure to glyphosate unless gloves and protective gear are used. When concerns arose about the use of POEA and European regulators considered banning the substance, Dr. Heydens wrote that Monsanto should defend the use of POEA, because a ban on POEA's use in Roundup would lead to a "domino effect" in other parts of the world Appx0690.

In 2016, EPA's Office of Research and Development prepared an internal agency report assessing studies dating from 1986 to 2013 that associated glyphosate exposure with increased risk of developing NHL. This EPA office concluded that there was "suggestive" evidence of glyphosate's carcinogenetic potential. Appx1642. However, EPA's Office of Pesticide Programs issued a paper in December 2017 stating that EPA could not reach "a conclusion regarding the association between glyphosate exposure and risk of NHL."[4] The paper explained

---

[3] In *Pilliod*, one expert testified that POEA made Roundup "about 50 times more genotoxic than glyphosate alone." *Pilliod*, 282 Cal. Rptr. 3d at 695.

[4] EPA Office of Pesticide Programs, Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential 68 (Dec. 12, 2017), https://cfpub.epa.gov/si/si_public_file_download.cfm?p_download_id=534487 (last visited March 15, 2023).

that the data was uncertain because "farmers and other applicators apply formulations, not the active ingredient alone."[5] The paper acknowledged that EPA's advisors had "conflicting views on how to interpret the overall results for NHL, and acknowledged the need for more research "to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[6]

In April 2019, EPA issued a proposed decision about the re-registration of glyphosate. The decision acknowledged that "[m]any commenters expressed concerns that glyphosate formulations are more toxic than glyphosate alone and questioned the toxicity of inert ingredients and the lack of transparency for inert ingredients and other contaminants in pesticide products."[7] EPA also acknowledged that "few research projects" had tried to compare "technical grade glyphosate" to glyphosate-based formulations like Roundup.[8] EPA continued that "[i]f at any time, information becomes available that indicates adverse human health effects of concern for exposure to glyphosate or its formulations, EPA intends to review it and

---

[5] *Id*. at 137.

[6] *Id*. at 67, 144

[7] EPA Glyphosate: Proposed Interim Registration Review Decision 10, No. 0178 (Apr. 2019), http://tinyurl.com/y6h2u8w6 (last visited March 15, 2023).

[8] *Id*. at 11.

determine the appropriate regulatory action."[9] *See Hardeman*, 997 F.3d at 952 (reviewing glyphosate's regulatory history).

> **2.  In 2015, the International Agency for Research on Cancer concluded that glyphosate is a probable carcinogen, after which EPA authorized labels referencing IARC's cancer conclusion.**

The International Agency for Research on Cancer ("IARC") is an agency of the World Health Organization that conducts and coordinates research into the causes of cancer. The IARC's classification system for carcinogenicity is based on strict scientific criteria and used throughout the world. In 2015, an IARC working group performed a systematic and independent review of publicly available studies concerning the health risks of glyphosate. The working group issued a monograph that classified glyphosate as a Group 2A carcinogen, meaning that glyphosate was "probably carcinogenic to humans." Appx0036, Appx0048-0051.[10] The working group concluded that strong evidence existed for the genotoxicity of both pure glyphosate and glyphosate formulations such as Roundup. It concluded that the cancers most associated with glyphosate exposure included NHL. Appx0036.

---

[9] *Id*.

[10] The IARC's approach to evaluating carcinogenicity is set forth in its preamble, located at https://monographs.iarc.who.int/wp-content/uploads/2019/07/Preamble-2019.pdf (last visited on March 28, 2023).

Based on the IARC's assessment of glyphosate, the California Office of Environmental Health Hazard Assessment ("OEHHA") published a notice in September 2015 of its intent to include glyphosate on the state's list of known carcinogens pursuant to California's Proposition 65. This California law requires businesses to provide warnings to Californians about exposures to chemicals "known to the State of California to cause cancer of reproductive toxicity." Appx0056. The OEHHA determined that glyphosate met the criteria for being listed because California law requires the listing of substantives that the IARC has identified as carcinogenic. *Id*. OEHHA officially added glyphosate to the Proposition 65 list of carcinogens in July 2017. Appx1490.[11]

In 2017, EPA authorized pesticide manufacturers to revise their labels to add the Proposition 65 glyphosate warning. Appx0208. But in August 2019, the Director of the Registration Division within EPA's Office of Pesticide Programs wrote an informal letter to the registrants of glyphosate-containing pesticides in reaction to California's warning requirement. Appx0192. Sent without notice and comment, and absent regulatory procedure, the letter stated that EPA disagreed with the IARC's assessment, that EPA had assessed glyphosate as "not likely to be

---

[11] Cal. Office of Env't Health Hazard Assessment, Glyphosate, https://oehha.ca.gov/proposition-65/chemicals/glyphosate (last visited March 15, 2023).

carcinogenic to humans," and that EPA would consider a Proposition 65 warning on a glyphosate-containing product to be a false and misleading statement. The letter stated that EPA would not approve labeling that included the Proposition 65 warning statement for pesticides containing glyphosate. Appx0192-0193.

In April 2022, the EPA's Assistant Administrator for the Office of Chemical Safety and Pollution Prevention sent another letter to the Director of OEHHA.[12] This letter from a higher-ranking official approved OEHHA's revised Proposition 65 warning, which specifically retained the statement that IARC has classified glyphosate as probably carcinogenic to humans and added reference to the EPA's "not likely" assessment as well. Appx1045-1046.[13] The letter stated that this proposed revision was sufficiently clear concerning EPA's assessment of glyphosate and could be approved by EPA. *Id*. California has used this EPA-approved warning ever since. Appx1485, Appx1490.

---

[12] This was a higher-ranking EPA official. *See* EPA Organizational Chart (Sept. 24, 2022), www.epa.gov/aboutepa/epa-organization-chart (last visited March 15, 2023); EPA Organization Chart for the Office of Chemical Safety and Pollution Prevention (OCSPP) (Nov. 1, 2022), www.epa.gov/aboutepa/organization-chart-office-chemical-safetyand-pollution-prevention-ocspp (last visited March 15, 2023).

[13] The EPA sent this letter to OEHHA before *Natural Resources Defense Council. v. U.S. Environmental Protection Agency*, 38 F.4th 34 (9th Cir. 2022) (discussed below), which vacated the EPA's "not likely" determination. *Id*. at 51.

### 3.     The Ninth Circuit vacated EPA's assessment that glyphosate is not likely to cause cancer.

FIFRA requires that "registrations of pesticides are to be periodically reviewed" by EPA every 15 years. 7 U.S.C. § 136a(g)(1)(A). Consistent with that mandate, EPA started a re-registration review of glyphosate in 2009. The review process eventually produced an Interim Decision in January 2020. In that Interim Decision, EPA stated that it had assessed the risks to humans from glyphosate exposure and reiterated its view that "there are no risks to human health from the current registered uses of glyphosate and that glyphosate is not likely to be carcinogenic to humans." Appx0234-0235.

The Natural Resources Defense Council challenged the human health assessment in the 2020 Interim Decision based on the EPA's administrative process during the analysis. That legal challenge resulted in a 2022 decision by the Ninth Circuit *vacating* the agency's conclusion that glyphosate was "not likely to be carcinogenic." The Ninth Circuit found that EPA's reasoning represented "the hallmark of arbitrary action." *Natural Resources Defense Council. v. U.S. Environmental Protection Agency*, 38 F.4th 34, 51 (9th Cir. 2022) (internal quotation marks omitted). The Court explained that a "not likely" descriptor was only appropriate under EPA guidelines where "robust" data showed "no basis for human hazard concern." But for glyphosate, "most studies EPA examined indicated that human exposure to glyphosate is associated with at least a somewhat *increased risk*

of developing NHL." *Id*.  In addition, the Court wrote, EPA's "not likely" conclusion did not withstand scrutiny under the agency's own framework. *Id*. EPA guidelines described how the agency may use historical-control data that show natural tumor prevalence in certain animal species. Historical-control data that uncovers rare tumors may bolster a case for carcinogenicity since a rare tumor was "unlikely to be due to chance." *Id*. at 47-48. But EPA used historical-control data "only to *discount* studies indicating that glyphosate may cause tumors." *Id*. at 48 (emphasis added). This one-sided approach even drew criticism from within EPA because it could "potentially introduce biases." *Id*. Rather than address those concerns, "the agency did not change the way in which it factored those data into its analysis." *Id*. Ultimately, the Ninth Circuit found that the "not likely" conclusion was unsupported by substantial evidence, that EPA's "errors in assessing human-health risks are serious," and that the interim decision had to be vacated. *Id*. at 47, 49. EPA did not seek further review. EPA's "not likely" human health determination has been vacated. *NRDC v. EPA*, No. 20-70787, Dkt. 143 (9th Cir. Aug. 24, 2022).

**D.     The procedural history of this litigation**

**1.     David and Theresa Schaffner sued Monsanto for injuries caused by Mr. Schaffner's exposure to Roundup.**

The Schaffners commenced this action in September 2019 in the Allegheny County Court of Common Pleas. Appx0028. To pursue recovery for the injuries caused by Mr. Schaffner's Roundup-induced cancer, the complaint described Mr.

Schaffner's regular use of Roundup during his decades of work as a professional landscaper and property owner. It also described Monsanto's misleading advertising concerning Roundup and its toxicity. Appx0040-0068. The complaint asserted six causes of action against Monsanto: (1) strict liability sounding in design defect, (2) strict liability sounding in failure to warn, (3) negligence, (4) breach of express warranty, (5) breach of implied warranty, and (6) negligent misrepresentation and/or fraud. Appx0070-0092. In October 2019, Monsanto removed the case on the basis of diversity of jurisdiction. Appx0100. The Judicial Panel on Multidistrict Litigation transferred the case to the Northern District of California for inclusion in MDL 2741. Appx0104.

### 2. In *Hardeman*, the Ninth Circuit rejected the same preemption arguments Monsanto makes here.

As noted above, *Hardeman* was another case in MDL 2741 alleging that a plaintiff developed NHL resulting from Roundup exposure. The plaintiff sued Monsanto, *inter alia*, for failure to warn about Roundup's health risks under California law. Monsanto moved to dismiss those failure-to-warn claims on FIFRA preemption grounds. The MDL court rejected those arguments by order entered April 8, 2016. Appx0014. When denying preemption, the MDL court explained that Mr. Hardeman's failure-to-warn claim was consistent with FIFRA because FIFRA's misbranding provision requires a pesticide "to contain a warning or causation statement which may be necessary and if complied with . . . is adequate to protect

health and the environment," 7 U.S.C. § 136(q)(1)(G), while California's common law sounding in failure to warn similarly provides for liability where a manufacturer fails to "warn either of any risk that is known or knowable (in strict liability) or at least those risks that a reasonably prudent manufacturer would have known and warned about (in negligence). Appx 0014-0015 (internal quotation marks omitted). If anything, the MDL court explained, a manufacturer's duty under California law may be narrower because (in negligence) a manufacturer is not liable where a warning would be unreasonable, whereas FIFRA requires a warning necessary and adequate to protect human health regardless of reasonableness. *Id*. At a minimum, the court concluded, "it's hard to see how Hardeman's failure to warn claims could be construed more broadly than FIFRA." *Id*. (citation and internal quotation marks omitted).

In response to Monsanto's argument that EPA's various actions concerning Roundup registration justified preemption, the MDL court noted that FIFRA's authorizing EPA to enforce FIFRA's provisions did not prevent private litigants from pursuing state-law claims for conduct that violated FIFRA. Indeed, the Supreme Court itself has "allowed private remedies that enforce FIFRA's misbranding requirement" and has rejected arguments "against giving juries in 50 States the authority to give content to FIFRA's misbranding prohibition." Appx00015 (quoting *Bates*, 544 U.S. at 448, 451) (internal quotation marks

omitted). The court added that this result was entirely consistent with FIFRA's provisions that registration was only "prima facie" evidence that a label complied with FIFRA's misbranding provisions, and that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense" under FIFRA. *Id.*, citing 7 U.S.C. § 136a(f)(2). The court concluded that "if EPA's approval of Roundup's label had the force of law, it would preempt conflicting state-law enforcement of FIFRA. But there's no indication that EPA's approval of Roundup's label had the force of law." Appx0016 (citations omitted). The court also rejected Monsanto's effort to find traction in preemption cases involving the Food, Drug & Cosmetic Act. "FDCA regulations don't 'give content to FIFRA's misbranding standards,' *Bates*, 544 U.S. at 453, so they don't affect the extent to which FIFRA preempts state law." *Id.*

In March 2019, *Hardeman* proceeded to a federal jury trial presided over by the MDL judge for Roundup litigation. The trial resulted in a plaintiffs' verdict and an award of $80 million in compensatory and punitive damages (later remitted to $25 million). *Hardeman*, 997 F.3d at 950-51. On appeal, Monsanto argued that the MDL court wrongly failed to dismiss Mr. Hardeman's claim on grounds of FIFRA preemption. The Ninth Circuit rejected Monsanto's express and implied preemption arguments. *Hardeman*, 997 F.3d at 954-60. Like the district court, the Court reasoned that FIFRA and California's failure-to-warn law were consistent with one

another, and further holding that EPA's registration and subsequent reregistration of glyphosate lacked the "force of law" necessary to establish them as "requirement" that could have preemptive effect in the first instance. Regarding implied preemption, the Ninth Circuit agreed that Monsanto had not established any of the thresholds to show that it would be "impossible" to comply both with FIFRA and state law providing for adequate warning of glyphosate's carcinogenicity. The Court also agreed that no analogy could be found in preemption cases involving the Food, Drug & Cosmetic Act given the different regulatory schemes that apply under that statute as compared to the broad latitude that FIFRA affords to manufacturers to change their labels to comply with FIFRA's misbranding statute. *Hardeman*, 997 F.3d at 954-60.

When Monsanto sought Supreme Court review of the Ninth Circuit's preemption analysis, the Supreme Court called for the views of the Solicitor General. In response, the United States submitted a brief explaining that "EPA's approval of labeling that does not warn about particular chronic risks does not by itself preempt a state-law requirement to provide such warnings." Appx1071. Regarding express preemption, the United States explained that the EPA's registration of a pesticide without a carcinogenicity warning does not establish a "requirement" that preempts underlying state law. That is because a "requirement is a rule of law that must be obeyed, whereas FIFRA does not define exactly the labeling that might be necessary

21

and adequate to protect public health and safety." Appx. 1076-1077. As for implied preemption, the United States wrote that "neither EPA's repeated statements that glyphosate is unlikely to be carcinogenic to humans, nor its approval of pesticide labeling without cancer warnings," contains sufficient force of law to preempt. 2022 WL 1489462 (U.S.), 13. The United States emphasized that "EPA has recently issued a letter identifying a proposed glyphosate warning that *would not* be considered false or misleading and that EPA could approve if requested for inclusion on glyphosate product labels."  *Id*. at 14 (emphasis added). So there is nothing impossible about a cancer warning on Roundup. The Supreme Court denied certiorari in June 2022. *See Monsanto Co. v. Hardeman*, 142 S. Ct. 2834 (2022).

### 3.    The MDL court rejected Monsanto's preemption arguments based on its earlier decisions in *Hardeman* and PTO 101.

In September 2021, Monsanto moved for summary judgment in this case on grounds of FIFRA preemption by incorporating preemption motions previously filed in the Roundup MDL, including those in *Hardeman*. Appx0006, Appx0765. The MDL court denied summary judgment "for the reasons set forth in the Court's prior orders." Appx026 (MDL Pretrial Order 273). The MDL court referenced Pretrial Order 101, which denied both express and implied preemption  arguments and within which the MDL court noted that it had already rejected Monsanto's express preemption arguments in *Hardeman*. Appx0020.

By denying FIFRA preemption in *Schaffner* on the basis of earlier preemption decisions, *Hardeman* (affirmed by the Ninth Circuit), the MDL court effectively incorporated those earlier decisions into the *Schaffner* analysis. The efficiencies realized by this approach serve a core purpose of the MDL system—efficient and coordinated resolution of global issues in MDL litigation. It is apparent that Monsanto seeks to revisit *Hardeman* itself.

### 4.    Settlement paved the way for this appeal.

On February 25, 2022, the MDL court remanded *Schaffner* to the Western District of Pennsylvania, where Plaintiffs reached an agreement with Monsanto. Appx0107, Appx0135. Pursuant to the agreement, Plaintiffs filed a consented-to motion seeking leave to amend their complaint such that the complaint would only retain Count II (strict liability sounding in failure to warn). Appx0138. The motion explained that the settlement agreement was subject to a reservation of Monsanto's right to appeal limited to the question of federal preemption. *Id*. The motion attached as an exhibit a proposed stipulation intended for entry of judgment that would be filed when the motion for leave was granted. *Id*.

The district court granted the motion to amend on September 27, 2022. Appx0004. Thereafter, the parties filed a Joint Stipulation for Entry of Judgment, which attached a proposed final judgment stating that judgment would be entered in Plaintiffs' favor as to Count II in the amount of $1.00. Appx0140. The Stipulation

stated that the parties had an understanding that Monsanto intends to appeal "the prior contested order of the MDL Court, as to the correctness of which the Parties remain adverse and in disagreement." *Id*. It stated that "Monsanto will pay Plaintiff an agreed amount that depends on the outcome of the appeal, encompasses all contingencies on appeal, and thereby allows entry of a final judgment by stipulation. *See generally Keefe v. Prudential Prop. & Cas. Ins. Co*., 203 F.3d 218 (3d Cir. 2000)." *Id.* On October 3, 2022, the district court entered judgment on the basis of the Joint Stipulation. Appx0013. Monsanto now appeals solely for the purpose of again asserting that FIFRA preempts Plaintiffs' strict liability claim sounding in failure to warn. Appx0012.

## V.    SUMMARY OF ARGUMENT

Monsanto wants this Court to find that FIFRA both expressly preempts and impliedly preempts Mr. Schaffner's common-law claim sounding in failure to warn. In doing so, Monsanto also is essentially asking this Court to override a decision of the MDL court that the Ninth Circuit already affirmed in Hardeman. Even if the MDL's ruling did not apply here (and it does), this Court should turn down all of these invitations because they lack merit.

First, as *Hardeman* held, there is no express preemption under FIFRA. The statute's express preemption clause states only that a state "shall not impose or continue in effect any requirements for labeling or packaging in addition to or

different from those required under this chapter." 7 U.S.C. § 136v(a)-(b). As the Supreme Court instructed in *Bates*, Mr. Schaffner's common-law claim for failure to warn does not even qualify as a "requirement" because it does not represent a "rule of law that must be obeyed." *Bates*, 544 U.S. at 445. Rather, a jury verdict holding Monsanto liable for failure to warn "merely motivates an optional decision," and thus does not possess the power to preempt. *Bates*, 544 at 447.

Express preemption is also inapplicable here because, even if Mr. Schaffner's claim did constitute a "requirement" under FIFRA (it doesn't), that claim does not impose a legal standard "in addition to or different from" FIFRA's misbranding provision, 7 U.S.C. § p§ 136(q)(1)(G), because it directly parallels and reinforces that section of FIFRA. Under the misbranding provision, a label violates FIFRA when it lacks "a warning or caution statement . . . adequate to protect health and the environment." *Id*. This language mirrors Pennsylvania's standard for proving strict liability sounding in failure to warn, which requires a plaintiff to show that the product lacked "sufficient warnings to notify the ultimate user of the dangers inherent in the product." *See Phillips v. A-Best Products Co*., 665 A.2d 1167, 1171 (Pa. 1995). So the preemption argument fails on this ground as well. Nor do EPA's registration decisions compel express preemption, because FIFRA itself deems EPA actions only to represent "prima facie" evidence of FIFRA compliance rather than a conclusive presumption that could represent to "a rule of law that must be obeyed."

*Bates*, 544 U.S. at 445. Under FIFRA, only a duly promulgated regulation can theoretically possess the power to preempt—and there is no such regulation at issue here.

Monsanto's implied preemption also fails. Monsanto has not provided "clear evidence" that it would be "impossible" for Monsanto to comply with FIFRA while also paying a monetary judgment upon a jury verdict in this case. Under *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668 (2019), to meet the heavy burden of showing impossibility, a manufacturer must present "clear evidence" that (1) the manufacturer fully informed the agency of the justifications for the warning that would be required by state law; (2) the agency informed the drug manufacturer that the FDA would not approve the change; and (3) the agency action at issue "carr[ies]the force of law." *Id*. at 1679. Monsanto has not presented "clear evidence" (or any evidence) that any of these exist here. Monsanto has never "fully informed" EPA of the need for a cancer warning. In fact, it has done the precise opposite by hiding evidence of Roundup's dangers for over half a century. Further, the agency action that Monsanto cites as evidence that EPA would reject such a warning (the August 2019 letter) has been disavowed by EPA itself in an earlier letter from 2017 and its later letter of April 2022 letter approving Proposition 65 language warning of glyphosate's potential to cause cancer, Appx0208, Appx1045, Appx1490

Not only do Monsanto's preemption arguments fail on their merits, but the Court should never reach those arguments in the first instance. Monsanto already litigated these arguments in *Hardeman*, where the Ninth Circuit ruled against Monsanto as a necessary part of affirming judgment in the plaintiff's favor. The *Hardeman* result along with Pretrial Order 101 are embedded in the MDL court's denial of summary of judgment in *Schaffner*. So Monsanto does more than seek to relitigate an issue that has been previously addressed. It seeks to relitigate the MDL-wide rejection of these preemption arguments as affirmed by a federal circuit court. The Court should apply principles of issue preclusion, and law of the case, to prevent Monsanto from undermining the integrity of MDL 2741 with respect to adjudicated pre-trial issues with global sweep.

## VI.   ARGUMENT

### A.   FIFRA does not expressly preempt Mr. Schaffner's claim sounding in failure to warn.

#### 1.   The standard of review

This Court exercises *de novo* review over questions of preemption. *See Sikkellee v. Precision Airmotive Corp.*, 822 F.3d 680, 687 (3d Cir. 2016).

#### 2.   FIFRA's express preemption language does not bar Plaintiff's failure-to-warn claim.

FIFRA preempts state laws that "impose or continue in effect any requirements for labeling or packaging in addition to or different from those required

under this subchapter." 7 U.S.C. § 136v(b). In *Bates*, the Supreme Court explained that a two-part test applies to determine whether FIFRA preempts a given state law. *Bates*, 544 U.S. at 444. First, the state law must be a "requirement" for labeling or packaging. *Id*. (quoting § 136v(b)). Second, the state law must impose a labeling or packaging requirement that is "in addition to or different from" those required by FIFRA. *Id*. (quoting § 136v(b)).

Under this framework, Mr. Schaffner's failure-to-warn claim is not expressly preempted by FIFRA. First, Mr. Schaffner's common-law claim does not impose a "requirement" under FIFRA because it does not represent a "rule of law that must be obeyed" such as duly promulgated federal regulation. *Bates*, 544 U.S. at 445; *Wyeth v. Levine*, 555 U.S. 555, 576 (2009). *Bates* distinguished a requirement for purposes of FIFRA from a common-law claim that produces a jury verdict that "merely motivates an optional decision" by the defendant to enhance its warnings. *Bates*, 544 at 447. *Bates* added that "[t]he long history of tort litigation against manufacturers of poisonous substances adds force to the basic presumption against preemption." *Id*. at 449-50. The history of litigation instead "emphasizes the importance of providing an incentive to manufacturers to use the utmost care in the business of distributing inherently dangerous items." *Id*. The Court concluded that "[i]f Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly." *Id*.

Mr. Schaffner's claim may subject Monsanto to liability, but the imposition of liability does not compel Monsanto to change its marketing practices, to obey a different set of legal obligations, or to do anything other than pay a money judgment. So while FIFRA provides for preemption of state-law "requirements," Mr. Schaffner's common-law claim is not a "requirement" for FIFRA purposes in the first place. *Id*.

Second, a Pennsylvania common-law claim sounding in failure to warn does not impose a requirement that is "in addition to or different from" any provision of FIFRA. In *Bates*, the Supreme Court made clear that common-law duties are not 'in addition to or different from" FIFRA's misbranding provision if they are "equivalent to and fully consistent with" that provision. *Bates*, 544 U.S. at 447. A state law meets this condition when it imposes "parallel requirements" such that a violation of the state law also would violate FIFRA. *Id*. at 454. Thus, the state law need not be phrased in the identical language as the misbranding provision. *Id*. The state law need only be "equivalent" to its federal counterpart. *Id*.

Here, FIFRA's misbranding provision and the elements of a Pennsylvania tort claim sounding in failure-to-warn mirror each other. The misbranding provision requires a pesticide label to "contain a warning or caution statement which may be necessary and if complied with . . . is adequate to protect health and the environment." 7 U.S.C. § 136(q)(1)(G). The requirement of adequacy does not turn

on the manufacturer's subjective knowledge about the pertinent risks. In the manner reminiscent of strict liability, misbranding occurs anytime a pesticide label fails to contain an "adequate" warning about a product's health risks. *Id*.

By way of comparison, under Pennsylvania law,[14] strict liability allows a plaintiff to recover for injuries caused by a product in "a defective condition unreasonably dangerous to the user or consumer." *Phillips*, 665 A.2d at 1171. To prove strict liability sounding in failure to warn, the plaintiff must show that the product lacked "sufficient warnings to notify the ultimate user of the dangers inherent in the product." *Id*. In other words, the plaintiff must prove that the warning of a particular danger was "either inadequate or altogether lacking." *Id*.; s*ee generally Avvo Corp*., 610 A.2d 454, 458-59 (Pa. 1992) (explaining Pennsylvania law that a product requires "adequate warnings or instructions necessary for safe use"); *Mackowick v. Westinghouse Electric Corp*., 575 A.2d 100, 102-03 (Pa. 1990) (reviewing Pennsylvania's law of strict liability sounding in failure to warning dating back to the Commonwealth's embrace of strict liability in 1966); *High v. Pennsylvania Supply, Inc*., 154 A.3d 341, 351 (Pa. Super. 2017) (reversing summary judgment and reinstating claim for strict liability sounding in failure to warn);

---

[14] Pennsylvania law applies since Mr. Schaffner lives and used Roundup in Pennsylvania. *See Stange v. Janssen Pharmaceuticals, Inc*., 179 A.3d 45, 65 (Pa. Super. 2018) (citing *Griffith v. United Air Lines, Inc*., 203 A.2d 796, 805 (Pa. 1964)).

*Commonwealth v. Monsanto Co.*, 269 A.3d 623, 664-67 (Pa. Cmwlth. 2021) (overruling Monsanto's objections to the Commonwealth's strict liability claim sounding in failure to warn).

These different legal regimes may use different language, but both formulations turn on the objective inadequacy of a product's warning. If anything, Pennsylvania's strict liability claim imposes a stricter framework than the misbranding standard in FIFRA given the need to prove the adequacy of warnings to an ultimate user, and especially given the practical reality that to full prove the full tort of strict liability sounding in failure to warn, a plaintiff must prove not only breach of duty (equivalent to the misbranding standard) but also that the inadequate warnings caused damages to a specific individual. [15] At a minimum, Pennsylvania's failure-to-warn claim affirmatively enforces FIFRA's misbranding prohibition by providing a method for accountability where product labels lack adequate warning about human health risks. Express preemption does not exist where there is equivalency between FIFRA and common-law claims. *See Bates*, 544 U.S. at 447-48, 454; *see also Medtronic v. Lohr*, 518 U.S. 479, 495 (1996) (explaining that a narrower state-law rule does not provide grounds for preemption).

---

[15] California law requires proof that a manufacturer failed to warn of a health risk that is "known or knowable." *See Conte v. Wyeth, Inc*., 168 Cal. App. 4th 89 (2008); *Hardeman*, 997 F.3d at 955 (concluding that California law involved a narrower standard than FIFRA's misbranding statute).

The unavailability of preemption over Mr. Schaffner's state-law claim is underscored by FIFRA's provision that registration represents only "prima facie evidence" that a pesticide's labeling comply with FIFRA. 7 U.S.C. § 136a(f)(2). FIFRA also provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under this subchapter. *Id*. So Congress made clear that even registration is at best a "rebuttable presumption" that a pesticide's label complies with FIFRA. *Hardeman*, 997 F.3d at 957. And that makes sense, since FIFRA's misbranding provision and supporting regulations specifically require manufacturers to report "additional factual information regarding unreasonable adverse effects" of the pesticide. 7 U.S.C. § 136d(a)(2); 40 C.F.R. § 159.152 (the duty to report additional information). These provisions would serve no purpose if registration equated to proof of compliance with FIFRA's misbranding provision. As the Ninth Circuit wrote in *Hardeman*, "[i]t would defy logic to say a rebuttable presumption carries the force of law necessary to have preemptive effective, as doing so would deny any ability to rebut the presumption." *Hardeman*, 997 F.3d at 956.

Given this statutory framework, EPA actions concerning Roundup—whether registering the product initially or making tentative assessment of safety based on available evidence—necessarily lack weight to anchor express preemption of Mr. Schaffner's claim. As noted in *Bates*, a "requirement" is a "rule of law that must be

obeyed." *Bates*, 544 U.S. at 445. Here, FIFRA's express language makes clear that even EPA's approval of a label during registration raises at best a "prima facie" case of adequacy under FIFRA's misbranding provision. EPA's labeling determinations lack the capacity to have preemptive effect when FIFRA itself provides that those determinations simply are not dispositive of FIFRA compliance. "And because EPA's labeling determinations are not dispositive of FIFRA compliance, they similarly are not conclusive as to which common law requirements are 'in addition to or different from' the requirements imposed by FIFRA." *Hardeman*, 997 F.3d at 956; *Bates*, 544 U.S at 541 ("Private remedies that enforce federal misbranding requirements would seem to aid, rather than hinder, the functioning of FIFRA"); *Indian Brand Farms, Inc. v. Novartis Crop Protection, Inc.*, 617 F.3d 207, 222 (3d Cir. 2010) (*Bates* established that "the mere inconsistency between the duty imposed by state law and the content of a manufacturer's labeling approved by EPA at registration did not necessarily mean that the state law duty was preempted."). Monsanto's express preemption arguments fail accordingly.

### 3. Monsanto's contrary arguments lack merit.

In seeking reversal, Monsanto argues that when EPA registered Roundup without requiring a health warning regarding carcinogenicity, EPA necessarily determined that such a warning was improper, and hence that a common-law claim for failure to warn about Roundup's carcinogenicity would impose an "additional"

requirement and be preempted under 7 U.S.C. § 136v(b). *See* Monsanto brief at 28-30. To advance this argument, Monsanto relies on *Bates* (interpreting FIFRA), *Riegel v. Medtronic, Inc*., 552 U.S. 312 (2008) (interpreting the Medical Device Amendments of the Food, Drug & Cosmetic Act), and *Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283 (9th Cir. 2021) (interpreting the Poultry Products Inspection Act). *See id*. at 30-36.

This line of argument does not support express preemption. As noted above, FIFRA does not endow registration with the gravity to support preemption of state-law claims. It instead provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under this subchapter," and that registration is merely "prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of the subchapter." 7 U.S.C. § 136a(f)(2). Rather than give registration any conclusive significance, FIFRA provides that a registered product can be deemed misbranded if the label "does not contain adequate instructions for use, or if its label omits necessary warnings of cautionary statement." *Bates*, 544 U.S. at 438 (citing 7 U.S.C. § 136(q)(1)(F), (G)). Separate from federal remedies, in an exercise of collaboration with the states, FIFRA also explicitly authorizes the states to "regulate the sale or use of any federally registered pesticide" provided that the state regulation does not permit a sale or use prohibited by FIFRA. 7 U.S.C. § 136v(a).

Given this statutory framework, Monsanto's puts far more weight on EPA's glyphosate-related actions than they can bear as a matter of law. In addition, EPA has not barred cancer warnings on glyphosate-containing products. As noted above, EPA authorized a cancer warning on such products in 2017, and then sent the April 2022 letter to OEHHA approving Proposition 65 language warning about glyphosate's carcinogenicity. Appx0208, Appx1485, Appx1490. Further, there is no meaningful difference between FIFRA's misbranding standard and a Pennsylvania tort claim sounding in failure to warn. Both require warnings to adequately notify about the dangers inherent in the product. *Cf. Phillips*, 665 A.2d at 1171 with 7 U.S.C. § 136(q)(1)(F). Express preemption is improper for all these reasons.

Monsanto's focus on the EPA's August 2019 letter illustrates the weakness of its preemption argument. First, that letter has since been disavowed by EPA itself. That aside, this Court has rejected the idea "that federal law capable of preempting state law is created every time someone acting on behalf of an agency makes a statement or takes an action within the agency's jurisdiction." *Fellner v. Tri-Union Seafood, L.L.C.*, 539 F.3d 237, 245 (3d Cir. 2008) (finding that an agency letter lacks force to preempt). The Supreme Court has added that "[i]t is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force."

*United States v. Mead Corp.*, 533 U.S. 218, 230 (2001). So it matters that the August 2019 letter "was not the product of any formal proceedings, was not published in the Federal Register, did not cite any new scientific findings, and took no position on whether Roundup causes cancer." *Hardeman*, 997 F.3d at 952. Further, the letter was followed by EPA's April 2022 letter explaining approving a revised Proposition 65 warning that referenced both the IARC's assessment that glyphosate is probably carcinogenic and the EPA's assessment (now vacated) that glyphosate is not likely to be carcinogenic. Appx1045. The August 2019 letter fails to compel preemption for all of these reasons.

Monsanto's reliance on EPA's 2020 Interim Decision re-registering glyphosate underscores the weakness of Monsanto's express preemption argument. This document states that "there are no risks to human health from the current registered uses of glyphosate and that glyphosate is not likely to be carcinogenic to humans." Appx0234-0235. This health assessment resulted in a legal challenge, which resulted in a Ninth Circuit opinion finding that (a) EPA's reasoning represented "the hallmark of arbitrary action;" (b) the "no risk" statement conflicted with the factual record and the agency's own internal guidelines; and (c) that EPA's health assessment was unsupported by substantial evidence and had to be vacated. *NRDC*, 38 F.4th at 46, 51. In addition to having been vacated, the 2020 Interim Decision's assessment of glyphosate's carcinogenicity cannot have the "force of

law" when at best it represents a view of scientific evidence rather than a statutory provision or duly promulgated regulation. *Id*.

Finally, Monsanto misplaces its reliance on *Bates*, *Riegel*, and *Cohen*. Of course, *Bates* is the leading Supreme Court case on the FIFRA preemption and makes clear the narrow scope of such preemption. In *Bates*, the Court explained that FIFRA might preempt a state law that would impose a labeling requirement "that diverges from those set out in FIFRA and its implementing regulations." *Bates*, 544 U.S. at 452. For example, FIFRA might preempt a law insisting that a pesticide label state the word "DANGER" when a federal regulation already has assigned classifications for pesticides and has assigned the term "CAUTION" to that pesticide; absent preemption, the state law would override the federal regulatory scheme. *Id*. at 453. But Monsanto's argument for preemption does not depend on requirements imposed by a duly promulgated federal regulation. It turns on EPA registration decisions that at best represent "prima facie" evidence of compliance with the misbranding standard and necessarily lack the "force of law" that could trigger preemption in the first instance. *See* 7 U.S.C. § 136a(f)(2); *Hardeman*, 997 F.3d at 956-57 (citing *Wyeth*, 555 U.S. at 576)). Thus, Monsanto's invocation of *Bates* only serves to prove the lack of preemption here.

Monsanto's reliance on *Riegel* is similarly misplaced. There, the Supreme Court considered express preemption under the Medical Device Amendments to the

Food, Drug & Cosmetic Act when the FDA approves a Class III medical device pursuant to FDA's rigorous process for "premarket approval. *See Riegel*, 522 U.S. at 322-30. The Court explained that the Medical Device Amendments had "swept back" state obligations and imposed "a regime of detailed federal oversight." *Id.* at 316. It explained the FDA's granting of premarket approval already served as "conclusive evidence" that the approved form of a Class III medical device "provides a reasonable assurance of safety and effectiveness." *Id.* at 323. The Court also explained that premarket approval "*is* federal safety review." *Id.* at 233 (emphasis in original). By contrast, registration amounts only to "prima facie" evidence of compliance with FIFRA's misbranding provisions, while FIFRA also provides for a "decentralized scheme" that leaves the states with significant power to regulate pesticides. *See Bates*, 544 U.S. at 450; 7 U.S.C. §§ 136a(f)(2), 136v(b). *Riegel* thus underscore that express preemption is not appropriate here.[16]

---

[16] It is apparent why Congress chose to regulate Class III medical devices more rigorously than pesticides, as these devices are "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health." 21 U.S.C. § 360c(a)(1)(C). In 21 U.S.C. § 360c(a)(1)(C). Congress foreclosed compensation of injured persons through the state tort system to encourage the manufacture of federally approved devices. *Id.* FIFRA's structure represents a different legislative choice stemming from the fact that insecticides, fungicides, and rodenticides cannot be tested on humans by their very nature. That fact limits the ability of regulatory entities to conclusively assess whether s product will be hazardous to human health. Unlike with medical devices, no human health concern can spring from over-warning about a pesticide's dangers.

Monsanto argues that reading *Bates* and *Riegel* together produces the conclusion that FIFRA registration along with EPA's determinations concerning glyphosate's carcinogenicity collectively amounts to a "requirement" for purposes of FIFRA preemption. *See* Monsanto's brief at 34-35. This argument is again belied by FIFRA's language that the registration amounts only to "prima facie" evidence that the pesticide's labeling complies with FIFRA's misbranding statute, which makes clear that registration represents at best a rebuttable presumption and lacks the "force of law" to support express preemption. 7 U.S.C. § 136a(f)(2). Monsanto's argument is further belied by EPA's April 2022 letter endorsing a cancer warning to be used in California's Proposition 65 language. Nothing more clearly shows that Mr. Schaffner's claim is not expressly preempted under § 136v(b) than EPA's own conclusion that an enhanced warning is consistent with FIFRA's misbranding provision. Appx1045.

Monsanto also misplaces its reliance on cases involving meat inspection. In *Cohen*, a consumer brought claims under California law alleging that the producer of chicken products had falsely advertised its products as natural and preservative-free. The main question on appeal was whether the record contained sufficient evidence to support the district court's finding that chicken labels has been approved by the Food Safety Inspection Service. The Ninth Circuit remanded for fact-finding. *Cohen*, 16 F.4th at 1287-90. Along the way, the Court explained that the Poultry

Product Inspection Act broadly preempts state laws regarding "marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter." *Id*. at 1287 (citing 21 U.S.C. § 467(e)). In *Thornton v. Tyson Foods, Inc*., 28 F.4th 1016 (10th Cir. 2022), the Tenth Circuit reviewed identical preemption language in the Federal Meat Inspection Act and explained that the language "sweeps widely" so as to prevent a state from imposing even nonconflicting rules or meat packaging and labeling. *Id*. at 1025. In contrast to those "sweep[ing]" provisions, FIFRA preemption only bars a "statutory or common-law rule imposing a labeling requirement divergent from those set out in FIFRA and its implementing regulations." *Bates*, 544 U.S. at 452. *Cohen* and *Thornton* illustrate the narrowness of FIFRA preemption. They confirm that Monsanto's express preemption arguments should be rejected here, as they were rejected in *Hardeman*.

**B.    FIFRA does not impliedly preempt Mr. Schaffner's claim sounding in failure to warn.**

### 1.    The standard of review

This Court exercises *de novo* review over questions of preemption. *See Sikkellee*, 822 F.3d at 687.

### 2.    Implied preemption is not available under FIFRA.

"The purpose of Congress is the ultimate touchstone in every preemption case." *Wyeth*, 555 U.S. at 565 For this reason, in all preemption cases, and particularly where Congress has legislated in a field that the States have traditionally

occupied (such as public health and safety), every preemption analysis starts with the assumption that federal law does not supersede the historic police powers of the States unless that result was the "clear and manifest purpose of Congress." *Id*. (citations and internal quotation marks omitted).

Here, there exists no debate about the scope of FIFRA preemption. Congress expressed its preemptive intent through § 136v(b), which states that preemption exists only where a state imposes "requirements for labeling or packaging in addition to or different from those required under this subchapter." 7 U.S.C. § 136v(b). That should end the analysis. The Supreme Court's decision in *Bates* also shows the incongruity of any purported implied preemption argument under FIFRA. In *Bates*, the defendant made both implied preemption and express preemption arguments. *See Bates v. Dow AgroSciences LLC*, No. 03-388 (U.S. Nov. 24, 2004), Brief for the Respondent 36-37, 2004 WL 2758217. When deciding *Bates*, the Supreme Court focused on express preemption *alone*. Justice Thomas observed in his concurrence that the Court's refusal to engage implied preemption doctrine "comports with this Court's increasing reluctance to expand federal statutes beyond their terms through the doctrine of implied preemption." *Bates*, 544 U.S. at 459 (Thomas, J., concurring in the judgment in part and dissenting in part). This reading of Bates comports with FIFRA's "narrow" preemption clause. *Id*. at 452.

In *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992), the Supreme Court stated that "[w]hen Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a 'reliable indicium of congressional intent with respect to state authority,' there is no need to infer congressional intent to preempt state laws from the substantive portions of the legislation." *Id.* at 517 (citations omitted). Since *Cipollone*, this Court has held that implied preemption can exist independent of express preemption in limited circumstances, *Fellner*, 539 F.3d at 249. But those circumstances do not exist where the Supreme Court effectively foreclosed the issue and where Congress' intent is clearly set forth in narrow terms that foreclose preemption as a matter of statutory construction. The Court should not allow forge a pathway through the doctrine of implied preemption that circumvents Congress' express language. It should follow the lead of *Cipollone* and *Bates* by viewing Congressional intent as fully expressed through § 136v(b).

### 3. FIFRA does not impliedly preempt Plaintiff's claim under impossibility preemption.

If implied preemption can apply, it still would not nullify Mr. Schaffner's claim anyway. Monsanto argues for "impossibility" preemption, under which a state law is preempted when it is impossible for a private party to comply with both state and federal requirements. *See Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1678-79 (2019). Under *Merck*, to demonstrate that it would be "impossible"

to comply with federal law while also complying with state law, Monsanto must present "clear evidence" that (1) EPA was "fully informed" of the justifications for the warnings that the Schaffners claim are required under Pennsylvania law; (2) EPA informed Monsanto that "it would not approve changing the . . . label to include that warning;" and (3) EPA"s actions "carries the force of law." *Id.*

Monsanto cannot establish any of these elements to establish "impossibility" preemption. First, "clear evidence" does not exist that Monsanto ever fully informed EPA about the reasons to warn consumers of the cancer risks associated with Roundup. If anything, the clear evidence points the opposite direction. As noted above, Monsanto has only tested glyphosate and has never conducted or submitted to EPA any testing of *formulated* Roundup including the surfactants that amplify glyphosate's effects and renders Roundup far more carcinogenic than glyphosate alone. *See infra*, pp. 6-13. Further, Monsanto has spent decades actually hiding the carcinogenicity of glyphosate from the EPA and the public. In the 1970s, Monsanto provided EPA with studies containing falsified information concerning glyphosate's toxicity. *Id*. In the 1980s, Monsanto convinced the EPA to abandon its finding that glyphosate causes cancer in mice. *Id*. In the 1990s, when Monsanto's genotoxicity consultant Dr. Parry advised Monsanto that recent studies indicated that glyphosate could be genotoxic and recommended that more studies be performed, Monsanto hid those recommendations from EPA (in violation of FIFRA), did not perform the

recommended studies, and ghost-wrote a significant article denying a connection between glyphosate and health risks to humans. *Id*. Monsanto later viewed the article as "invaluable asset" when responding to regulatory agencies including EPA and described the article as a "valuable resource" when responding to product liability claims. *Id.* And in the 2010s, Monsanto fought concerns that the surfactant POEA could contribute to glyphosate's genotoxicity and did not perform studies on the issue. *Id*. In short, there is no "clear evidence" that Monsanto sought to put concerns about Roundup's carcinogenicity before EPA. So *Merck*'s first prong is not met.

Second, clear evidence does not exist that EPA told Monsanto that it would disapprove a proposal to warn about glyphosate's cancer risk. As a starting point, Monsanto never asked EPA to consider an enhanced warning. But had Monsanto asked, one need not speculate on what EPA would do. In 2017, EPA approved pesticide labels with the Proposition 65 glyphosate cancer warning. Appx0208. After EPA changed its mind in the August 2019 letter, EPA wrote in April 2022 that indeed it could approve a Proposition 65 warning on Roundup that referenced the IARC's assessment that glyphosate was probably carcinogenetic. Appx1045, Appx1490. These EPA actions point to possibility and supportive decisions that enable adequate public warning about the health risks of Roundup. So *Merck*'s second prong is not met either.

Finally, EPA's actions concerning glyphosate—most notably the August 2019 letter—simply do not carry the force of the law. Under FIFRA, registration only establishes a "prima facie" case of compliance with FIFRA's labeling standards—one that is rebuttable with additional information. 7 U.S.C. § 136a(f)(2) (registration shall not "be construed as a defense for the commission of any offense" under FIFRA). So EPA's registration (and reregistration) of Roundup without a cancer warning would not possess the power to preempt, even had the EPA's assessment about glyphosate's carcinogenicity not been invalidated by the Ninth Circuit in *NRDC*, *supra*.

The August 2019 letter also does not carry the "force of law" given that the letter was issued without written notice, without a hearing or opportunity to respond, and without any associated fact-finding process. *See Hardeman*, 997 F.3d at 956-57 (rejecting Monsanto's argument that EPA's glyphosate-related actions carry the force of law); *Merck*, 139 S. Ct. at 1679 (only agency actions taken pursuant to Congressional delegated authority could endow the agency the agency with the power to act); *Mead*, 533 U.S. at 230 ("Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force."). Further, whatever weight the August 2019 letter might have enjoyed was nullified by EPA's actions in 2017 and 2022 approving

warnings that advised of glyphosate's potential to cause cancer. Appx0208, Appx1045, Appx1490.

On top of all of this, in *Hardeman*, the United States itself confirmed that it was not impossible for Monsanto to provide an enhanced warning while also complying the FIFRA. Appx1060. The United States explained that even EPA's assessment that glyphosate was unlikely to be a human carcinogen and its subsequent August 2019 letter did not actually foreclose Monsanto from providing additional chronic-risk warnings—e.g., a warning consistent with the Proposition 65 language that EPA itself approved in April 2022. Appx1079-1081. When EPA itself (through the Solicitor General) says that an enhanced warning is not impossible, that is good evidence that Monsanto also has failed to prove *Merck*'s third prong.

In addition, Monsanto wrongly argues that it was unable to enhance a warning without EPA's prior approval. As the Ninth Circuit explained in *Hardeman*, a manufacturer can make minor modifications to labeling that have "no potential to cause unreasonable adverse effects to the environment" without prior EPA approval if EPA is notified of the change. *See Hardeman*, 997 F.3d at 959-960 (discussing 40 C.F.R. § 152.46(a)). Even under EPA's general labeling rules, a manufacturer may change a pesticide label by drafting and submitting a revised label to EPA; the registration "shall" be amended to reflect the change upon an EPA determination that the proposed change does not violate FIFRA. 7 U.S.C. § 136a(f)(1). In any

event, Monsanto never applied for any such label change. Monsanto's failure to act does not equate to impossibility. For these reasons as well, it was not impossible for Monsanto to add a cancer warning to the Roundup label. *See Wyeth*, 555 U.S. at 573 (impossibility preemption is a "demanding defense").

## C.　Monsanto's preemption arguments are foreclosed by principles of issue preclusion and law of the case.

### 1.　The standard of review

This Court does not have a definitive standard of review regarding the application of collateral estoppel. *See Witkowski v. Welch*, 173 F.3d 192, 198 n.7 (3d Cir. 1999) (reviewing decisions applying abuse of discretion or de novo standards of review). Here, the MDL court did not expressly consider the issue preclusion in the first instance. Issue preclusion instead raises an alternative ground for affirmance that the Court may exercise in its discretion. *See In re: Asbestos Products Liability Litig. (No. VI)*, 873 F.3d 232, 240 (3d Cir. 2017). This case presents a significant circumstance for the exercise of that discretion.

### 2.　Monsanto's arguments are precluded by *Hardeman*.

Collateral estoppel derives from the legal principle that "later courts should honor the first actual decision of a matter that has been actually litigated." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4416 (1981). As the Supreme Court has written, "the usual rule is that merits of a legal claim once decided in a court of competent jurisdiction are not subject to

redetermination in another forum." *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 485 (1982). Under this rule, "a losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one he subsequently seeks to raise." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991). This Court also has explained that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Delaware River Port Authority v. Fraternal Order of Police*, 290 F.3d 567, 572 (3d Cir. 2002); *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 457 F.3d 244, 254-55 (3d Cir. 2006) (emphasizing the "vital interest" in protecting "judicial determinations that were the products of costly litigation and careful deliberation").

Borrowing from the Second Restatement of Judgments, this Court has explained that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same of a different issue." *Jean Alexander*, 458 F.3d at 249 (quoting Restatement (Second) of Judgments § 27 (1982)). Under this framework, issue preclusion is not confined to circumstances where the parties are completely identical. Issues preclusion may apply offensively against a party that was subject to a valid and final

judgment when the asserting party was not involved in that prior case. This "non-mutual offensive collateral estoppel" operates to prevent the earlier-bound party from relitigating an issue when (1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually determined; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment. *Home Depot USA, Inc. v. Lafarge North America, Inc*., 59 F.4th 55, 63 (3d Cir. 2023); *Witkowski*, 173 F.3d at 199-200 (mutuality is not required for the application of collateral estoppel).

Here, Monsanto argues that FIFRA preempts a common-law claim sounding in failure to warn after appealing the MDL court's order denying summary judgment dated February 25, 2022. Appx0026, Appx0767. In that order, the MDL court explained that it denied Monsanto's preemption arguments for the reasons set forth in earlier orders including Pretrial Order 101, which also rejected Monsanto's preemption arguments while noting that the Court also had rejected Monsanto's preemption arguments in *Hardeman*. Appx0020. Of course, in *Hardeman*, the MDL court's preemption ruling was affirmed by the Ninth Circuit upon an extensive analysis that addressed (and rejected) the same preemption arguments that Monsanto again makes in this case. *See Hardeman*, 997 F.3d at 954-60.

The MDL court did not address estoppel when denying summary judgment order in *Schaffner*. The concept that the MDL court had made a global decision that

applied to all MDL 2741 cases was completely obvious. The only natural way of applying the global import of the MDL court's global rejection of Monsanto's preemption arguments was to explain the decision in *Schaffner* as consistent with prior orders anyway. But Monsanto having undertaken this appeal, issue preclusion should apply to Monsanto's effort to relitigate the MDL court's prior decisions.

Of the four criterial that govern issues preclusion, three of them unquestionably have been met: (2) Monsanto's express and implied arguments were actually determined by the Ninth Circuit in *Hardeman*; (3) those preemption issues were determined by a final and valid judgment (underscored by the Supreme Court's denial of certiorari); and (4) those determinations were necessary to the judgment in Mr. Hardeman's favor. *See Home Depot*, 59 F.4th at 63 (3d Cir. 2023) (stating the four-part test for collateral estoppel).

Only the first prong— whether "the issue sought to be precluded is the same as that involved in the prior action"—remains to be assessed. The Third Circuit provides a clear framework for evaluating this prong. "Identity of the issue is established by showing that the same general rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules." *Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000); *McKenna v. Metropolitan Life. Ins. Co.*, 126 Fed. Appx. 571, 576 (3d Cir. 2005) (same). The test can be parsed into two

sections: whether the same general rules govern both cases, and whether the facts are indistinguishable as measured by those rules.

Initially, the same rules govern the preemption arguments that Monsanto advanced in *Hardeman* and advances here. FIFRA is the same. So are the cases that assess the scope of FIFRA preemption such as *Bates*. Monsanto has effectively appealed *Hardeman* itself as incorporated into Pretrial Order 101 and thence into the *Schaffner* summary judgment order. Monsanto's arguments are also largely identical to those it raised in *Hardeman*. In both cases, Monsanto argues that FIFRA expressly and impliedly preempts a common-law claim for failure to warn based on EPA's actions concerning the registration of glyphosate and the agency's assessments of glyphosate's carcinogenicity. *See Hardeman*, 997 F.3d at 954-60; Appellant's brief at 24-57. As in *Hardeman*, Monsanto argues that EPA's prior labelling approvals amount to "requirements" of federal law that override Mr. Hardeman's and Mr. Schaffner's claims under state law. As in *Hardeman*, Monsanto argues that liability for failing to provide a warning of carcinogenicity equates to a "requirement" that is "in additional" to what FIFRA required and hence Mr. Schaffner's claims are void from the outset. *Id.*

While *Hardeman* and *Schaffner* involve different state law, there exists hardly any difference between California and Pennsylvania law in terms of their substantive standards for pursuing a strict liability claim sounding in failure to warn. The

Pennsylvania version requires proof that the subject product lacked "sufficient warnings to notify the ultimate user of the dangers inherent in the product" such that the plaintiff must prove that the warning of a particular danger was "either inadequate or altogether lacking." *Phillips*, 665 A.2d at 1171. California's counterpart similarly requires a manufacturer to warn of any health risk that is "known or knowable." *Conte*, 85 Cal. Rptr. 3d at 310. If anything, Pennsylvania law is narrower than California law (and FIFRA). So the legal questions posed by *Hardeman* and this case are exactly the same. The answer provided in *Hardeman* must be the same as well. Which makes sense, since Monsanto is effectively appealing the *Hardeman* order as incorporated into the *Schaffner* ruling.

The "second bite at the apple" character of Monsanto's appeal is underscored by the fact that Monsanto devotes nine pages of its brief to now arguing *Hardeman* was wrongly decided. *See* Appellant's brief at 42-49. When Monsanto takes aim at *Hardeman*, Monsanto is criticizing an MDL judge's decision that applies across MDL 2741 including this case. As the MDL court explained in its order denying summary judgment, the Court relied on earlier-entered orders such as Pretrial Order 101 (which incorporated *Hardeman*) in order "[t]o avoid relitigating issues previously ruled upon by the Court." Appx0026. Monsanto's appeal should be deemed foreclosed by issue preclusion alone.

"Law of the case" represents another preclusion doctrine that is exactly on point.. This doctrine provides that "one panel of an appellate court generally will not reconsider questions that another panel has decided on a prior appeal in the same case." *In re City of Philadelphia Litig.*, 158 F.3d 711, 717 (3d Cir. 1998). "The doctrine is designed to protect traditional ideals such as finality, judicial economy, and jurisprudential integrity." *Id*. (citations omitted). The doctrine precludes review those legal issues that the court in the prior appeal actually decided; it does not apply to dicta. *Id*.

Here, Monsanto asks the Third Circuit to reassess a global decision of an MDL court that that was affirmed by the Ninth Circuit in a comprehensive assessment that was necessary to the affirmance of the *Hardeman* judgment. Perhaps because Monsanto's request is so audacious, research has not disclosed a case where an MDL court entered a global decision on a fundamental pre-trial legal issue that was affirmed by the circuit court encompassing that MDL court, and then the defendant filed an appeal in an entirely different federal circuit court to collaterally attack the earlier circuit court ruling. Nevertheless, the Court has usefully addressed law of the case doctrine to address the relationship of transferor and transferee court in the MDL context. The Court has explained that "there is nothing in the rules adopted by the Joint Panel on Multidistrict Litigation that authorizes a transferee judge to vacate or modify the order of a transferor judge. Moreover, we do not believe that Congress

intended that a "Return to Go" card would be dealt to parties involved in MDL transfers." *In re Pharmacy Benefit Managers Antitrust Litig*., 582 F.3d 432, 442 (3d Cir. 2009) (internal citations omitted). This Court also has emphasized that law of the case doctrine "is particularly applicable to multidistrict litigation in which the presence of a large number of diverse parties might otherwise result in constant relitigation of the same legal issue." *Id*., quoting *In re Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig*., 664 F.2d 114, 119 (6th Cir. 1981)).

The principles that govern the relationship between transferor and transferee district courts apply equally to the circuit courts that review the district court rulings. The JPML created MDL 2714 to promote the efficient facilitation of pretrial proceedings in Roundup litigation. *See In re Roundup Product Liability Litig*., 214 F. Supp. 3d 1346. No legal issue could be more quintessentially pretrial than whether federal law preempts the plaintiffs' state-law claims. The Court should not allow Monsanto to serially relitigate the MDL court's decision on a global issue that has been affirmed by another federal circuit court. To do otherwise would allow Monsanto to "frustrate the principle aims of the MDL process and lessen the system's effectiveness" by allowing it to continually relitigate decisions of the MDL court after remand to the MDL transferee court. *In re Ford Motor Co*., 591 F.3d 406, 411-12 (5th Cir. 2009); *Rowland v. Novartis Pharmaceuticals Corp.,* 9 F. Supp. 3d 553, 559-60 (W.D. Pa. 2014) (agreeing that a transferee court generally is prohibited

from reconsidering the MDL court's decisions). Especially given that the MDL court's decision has been affirmed by a coordinate circuit court, this Court should support the integrity of the MDL system by declining to reach the merits of Monsanto's appeal under the doctrines of issue preclusion and law of the case.

## VII.   CONCLUSION

The Court should affirm the order denying summary judgment.

Respectfully submitted,

By:    /s/ Charles L. Becker
Charles L. Becker
Ruxandra M. Laidacker
**Kline & Specter, PC**
1525 Locust Street
Philadelphia, PA  19102
(215) 772-1000

Adrian N. Roe
Michael. D. Simon
**Roe & Simon LLC**
2520 Mosside Boulevard,
Monroeville, PA 15146
(412) 856-8107

Dated:  April 11, 2023          *Attorneys for Appellees David Schaffner, Jr.*
*and Theresa Sue Schaffner*

# <u>COMBINED CERTIFICATIONS</u>

*Bar membership*. I am a member of the bar of the United States Court of Appeals for the Third Circuit.

*Word limit*. This document complies with the type volume requirements of Fed. R. App. P. 32(a)(7)(B) because it contains 12,637 words as calculated with the word-counting feature of Microsoft Office, excluding the portions of the document exempted by Fed. R. App. P. 32(f).

*Typeface and typestyle*. This document complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in 14-point Times New Roman font, which is a proportionally spaced typeface, using Microsoft® Word for Microsoft 365 MSO (Version 2301).

*Identical copies*. The text of the electronic brief is identical to the text in the paper copies.

*Virus check*. The electronic brief has been scanned for viruses with Vipre Business software. No virus was detected by the software.

By:    /s/ Charles L. Becker
       Charles L. Becker

Dated:  April 11, 2023

## **CERTIFICATE OF SERVICE**

I certify that the foregoing was served via the Court's electronic case management system upon all counsel of record.


                                                    /s/ Charles L. Becker
                                                   Charles L. Becker.


Dated: April 11, 2023